IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **DEON GLENN**, | Case No. 4:12 CV 1011 |
| Petitioner, | Judge James S. Gwin |
| v. | REPORT AND RECOMMENDATION |
| **BENNIE KELLY**, | |
| Respondent. | Magistrate Judge James R. Knepp II |

### INTRODUCTION

*Pro se* Petitioner Deon Glenn filed a Petition seeking a writ of habeas corpus under 28 U.S.C. § 2254 contending there was insufficient evidence to support his conviction for one count of murder and five counts of attempted murder with a firearm specification. (Doc. 1). Respondent filed a Return of Writ with attached exhibits. (Doc. 7; Doc. 7-1–7-22). Petitioner requested and was granted an extension of time to file a traverse but never filed one. (*See* Doc. 8, Doc. 9).

The district court has jurisdiction over the Petition under 28 U.S.C. § 2254(a). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(2). (Non-document entry dated June 27, 2012). For the reasons below, the undersigned recommends denying and dismissing the Petition.

### FACTUAL BACKGROUND

Pursuant to 28 U.S.C. § 2254(e)(1), findings of fact made by the state court are presumed correct, and the petitioner may only rebut them by clear and convincing evidence to the contrary. *See McAdoo v. Elo*, 365 F.3d 487, 493–94 (6th Cir. 2004). The Seventh District Court of Appeals set forth the following factual background:

[*P1] Appellant, Deon Glenn, appeals the judgment entry of the Mahoning County Court

of Common Pleas convicting him on one count of murder, in violation of R.C. 2903.02(A)(D), a felony of the first degree (a lesser included offense of the original charge of aggravated murder), five counts of attempted murder, in violation of R.C. 2903.02(A)(D), felonies of the first degree, and six firearm specifications pursuant to R.C. 2941.146(A).

[*P2] According to the testimony at trial, Appellant, while riding in the front-passenger seat of a car on the north side of Youngstown, drew a .380 caliber semiautomatic handgun and fired approximately five shots at a group teenagers walking from a block party on May 25, 2007. One of the teenagers, Maressia Patterson, was fatally wounded. Another, Akeem Minor, was shot in the leg. The other five high school students, Raheem Minor, Hanibol Minor, Dewaylon Green, Kenny Bullock and Maurice McQueen, escaped without injury.

[*P3] Appellant contends that there was insufficient evidence to prove that he purposely or voluntarily caused Patterson's death or attempted to cause the death of the other high school students based on the random pattern of gunshots. In the alternative, he argues that the manifest weight of the evidence proves that he did not purposely or voluntarily cause Patterson's death or attempt to cause the death of the other students based on the random pattern of the gunshots and the combination of stimulants and depressants in his system that evening. For the following reasons, both of Appellant's assignments of error are without merit.

[*P4] According to his testimony at trial, Appellant bought a HiPoint .380 semi-automatic pistol three days before the shootings to protect himself, his home, and family. (Tr., pp. 798-799.) He was walking home from Life Skills, a charter school catering to at-risk students in the city, and was approached by a neighborhood acquaintance who offered to sell him the gun and ammunition for $80. The gun was loaded when he purchased it. (Tr., p. 823.)

[*P5] Appellant considered himself a part of a group of students, mainly from Chaney High School, who referred to themselves as "BMF," an abbreviation for "[b]itches, money, fame." (Tr., pp. 343, 802.) BMF was not a criminal enterprise, they were a group of friends who tried to be "the life of the part[y]," and engaged in dance-offs with other groups. (Tr., pp. 343, 802.) One such group was comprised of students, mainly from the Rayen School, who referred to themselves as "BBH," an abbreviation for "[b]rothers before hoes." (Tr., pp. 342, 382.) Like "BMF," "BBH" had no criminal purpose, they were a group of friends who enjoyed flaunting their style and dancing ability. (Tr., pp. 382, 551.)

[*P6] The two groups conversed and occasionally "trash talk[ed]" on MySpace. (Tr., 383.) However, the testimony at trial established that the rivalry between the groups was not always friendly. Hanibol Minor testified that the MySpace exchanges were intended to incite violence, even though Raheem Minor testified that this was not the main thrust of the dialogue. (Tr., pp. 344, 384.) Bullock testified that a dispute existed between the two groups that began at a party a few months before the shooting. (Tr., p. 581.) Raheem

2

Minor admitted that there were problems between his twin brother, Akeem, and Robert Jackson (Tr., p. 344.) Jackson testified that he had some disputes with the Minors, but they had been resolved. (Tr., p. 451.) According to Jackson, he talked to the Minors and they agreed that it was childish to fight every time they saw one another. After that discussion, they had attended a prom after-party without any problems. (Tr., p. 451.)

[*P7] On May 25, 2007, Jackson called Appellant to invite him to attend a party on the north side of the city. (Tr., p. 809.) Appellant testified that he took the handgun to the party for his own safety even though he was not expecting any trouble. (Tr., p. 810.) Jackson picked up Deandre Brooks and Braylyn Williams on the way to the party. (Tr., p. 811.)

[*P8] The young men stopped at a gas station where Appellant purchased three Rockstar energy drinks. (Tr., p. 813.) Appellant said he consumed these drinks at the party, in addition to a styrofoam cup full of Hennessy, a cognac. He also smoked one-half of a six inch cigar emptied of tobacco and filled with marijuana. (Tr., pp. 815-817.) Appellant testified that he was "not a smoker or a drinker," but that he had tried marijuana "probably one time" in the past. (Tr., pp. 818-819, 865.) He further stated that he never consumed alcohol prior to that evening. (Tr., p. 818.)

[*P9] According to Appellant, he did not know Patterson, and did not see her, the Minor brothers, Bullock, or McQueen at the party. (Tr., p. 819.) He testified that he did not know the meaning behind the abbreviation "BBH" until the police told him the day after the shooting. (Tr., p. 861.) Appellant further testified that the party broke up when police arrived on the scene after gunshots were fired. (Tr., p. 822.)

[*P10] According to his testimony, Appellant was leaning against Jackson's car when the police arrived, and the alcohol "rushed [him]" and he felt intoxicated. (Tr., p. 824.) The boys left the party in Jackson's car with the intention of attending another party on Benita Avenue. Appellant was seated in the front passenger seat. (Tr., p. 417.)

[*P11] Appellant claimed at trial that he did not remember what occurred at the intersection of Norwood Avenue and Ford Avenue that evening. (Tr., p. 825.) He recalled firing the handgun but stated:

[*P12] "To be honest with you, I didn't have a reason to really even, you know, expose the weapon. I was -- I wasn't in my right state of mind. I don't know, I was intoxicated. I didn't really think -- I wasn't thinking. I don't know what I was thinking at the time." (Tr., p. 826.)

[*P13] Appellant testified that he did not intend to hurt anyone and that he did not know any of the teenagers walking on Ford Avenue. (Tr., pp. 827-828.) He claimed that he was aware of the consequences of pointing a gun at someone and shooting at them, but he claimed that is not what he did. (Tr., p. 828.) He said he was aiming the gun "in the air." (Tr., p. 849.) He testified that he regretted taking the handgun with him that evening and experimenting with alcohol and drugs because he "[didn't] know how much it would take to throw [him] off [his] rocks and everything." (Tr., p. 827.)

3

[*P14] Appellant conceded that he fired every round in the handgun that evening. (Tr., p. 878.) Appellant also conceded that he had to repeatedly pull the trigger in order to continue firing the handgun. (Tr., p. 845.)

[*P15] At the second party, Jackson learned that a girl had died as a result of the shooting and he so informed Appellant, who never left the car at the second party. (Tr., p. 831.) When Appellant returned to his home, he went to the back of the garage to "contemplat[e]" the fact that a girl had died and he may have killed her. (Tr., pp. 830-831.) He says he considered suicide before discarding the handgun behind the garage. (Tr., p. 832.) Appellant testified that he went to sleep hoping to wake up in the morning and discover that no one had died as a result of the previous evening's events. (Tr., p. 833.) A police car was in Appellant's driveway the following morning when he awoke. (Tr., p. 833.)

[*P16] On cross examination, Appellant conceded that he did not divulge the location of the gun when asked by the police, but he claimed that this failure was due to his embarrassment about his suicidal thoughts. (Tr., p. 839.) He appeared reluctant to admit that he had entertained suicidal thoughts at trial. (Tr., p. 871.)

[*P17] All of the teenage witnesses who had been walking from the party testified, and each presented essentially the same testimony. They were walking north on Ford Avenue when they saw Jackson's red car turn onto Ford Avenue travelling southbound, followed by another car. (Tr., pp. 348, 387, 503-504, 521-22.) Someone in Jackson's car called out, "[a]re y'all BBH." (Tr., pp. 349, 387, 503, 521.) Akeem, Green, and Bullock specifically identified Appellant as the person who asked the question. (Tr., pp. 522, 555, 580.) One of the teenagers responded, "[h]ell yeah." (Tr., pp. 350, 388, 505, 521, 581.) Jackson's car turned right onto Norwood, and shots were fired from the front passenger seat. (Tr., pp. 351, 388-389, 505-507, 555, 580.) Raheem and Hanibol testified that they heard five or six shots. (Tr., pp. 354, 389.) Bullock heard seven shots. (Tr., p. 583.)

[*P18] Raheem and Hanibol conceded that it is common for party guests to fire handguns up in the air. (Tr., pp. 365, 389.) Green and Bullock both testified they thought, at first, that Appellant was firing his handgun into the air. Green stated that this was his belief until he saw that the handgun was aimed at the group. (Tr., p. 557.) Bullock thought the same until he heard the bullets whizzing past. (Tr., p. 583.)

[*P19] Raheem testified that the gunman was shooting "[d]irectly at [the students walking on Ford Avenue]." (Tr., p. 373.) Hanibol also felt the bullets fly past him. (Tr., p. 389.) Akeem testified that Appellant was "[a]iming towards [the students] as a crowd." (Tr., p. 524.)

[*P20] The teenagers scattered when they heard the gunfire. (Tr., pp. 353, 508, 524, 558.) Raheem ran behind a "wall of trees." (Tr., p. 353.) Hanibol ran to an abandoned house. (Tr., p. 391.) Patterson ran for cover behind a tree with McQueen, then twice screamed, "I think I just got shot," and fell to the ground. (Tr., pp. 352, 374, 390, 558.) Akeem was shot in the leg. (Tr., p. 525.) He ran behind a house with Bullock, then

Bullock carried him on his back to Saranac Avenue, where friends took Akeem to the hospital. (Tr., p. 525.)

[*P21] Akeem and Bullock both identified Appellant as the gunman when the shooting started. (Tr., pp. 523, 582.) According to Raheem, Jackson's car rode by a second time, and at that point he recognized Appellant as the gunman. (Tr., p. 352.) Green and Bullock also testified that Jackson's car drove past the crime scene a second time. (Tr., pp. 559, 589.) Green testified that as he stood over Patterson's body, Appellant said, "don't run now, Big Boy, or something, I'm going to get you too. Something like that." (Tr., p. 559.)

[*P22] Jackson and Brooks, who were passengers in Jackson's car, both testified at the trial. Jackson testified that Appellant's behavior was "regular" when they left Lora Avenue on their way to the second party on Benita Avenue. (Tr., p. 446.) Jackson said that after he turned onto Norwood Avenue he suddenly "hear[d] sparks flying out of a shotgun, shots." (Tr., p. 421.) The shots were coming from his passenger seat. (Tr., 421.) He could not see the direction in which Appellant was shooting the handgun. (Tr., p. 466.) Jackson also said he did not hear any shouting back and forth between Appellant and the group of students prior to the shooting. According to Jackson, when Appellant was finished shooting he sat back in his seat, and Jackson kept driving. (Tr., p. 424.)

[*P23] Brooks testified that he did hear Appellant yell, "[y]'all BBH" to the students walking on Ford Avenue. (Tr., p. 478.) After the car turned onto Norwood Avenue, Appellant started shooting. (Tr., p. 479.) Brooks did not see the direction of the shots, either, but heard four or five shots. (Tr., p. 480.)

[*P24] They attended the party on Benita, where everyone was talking about the dead girl from the party on Lora. (Tr., p. 429.) Brooks testified that all of the occupants of the car wanted to go home when they heard that Patterson was dead. (Tr., p. 482.)

[*P25] Jackson drove his passengers to their respective homes and then he went to a friend's house, where his friend discovered five shell casings in his car. (Tr., p. 431.) One shell casing was found on Norwood Avenue approximately 135 feet past the intersection of Ford Avenue and Norwood Avenue, and another was found in the driveway of Appellant's house. (Tr., pp. 622-623.)

[*P26] Detective Rick Spotleson was the lead detective assigned to the case. He testified that Hanibol, Green, and McQueen were at the scene when he arrived, and they told him that "Deon" was the gunman. (Tr., p. 674.) He contacted Jackson and made arrangements to meet with him. (Tr., p. 674.) Based on the information provided by Jackson, Spotleson obtained and executed an arrest warrant for Appellant and searched his house. (Tr., pp. 682-683.)

[*P27] Jackson was charged with murder and attempted murder, but pleaded to obstruction of justice and offered his testimony at trial in exchange for the dismissal of the other charges. (Tr., p. 435.)

5

[*P28] Spotleson interviewed Appellant within ten hours of the shooting. (Tr., p. 684.) He testified that Appellant did not appear to be under the influence of alcohol or drugs, and that Appellant asked him what Jackson had told the police about the events of the previous evening. (Tr., p. 685.) Appellant also asked what a judge would believe, appeared to claim he did not intend to shoot anyone and asked how much prison time he was likely to get. (Tr., p. 686.)

[*P29] When the conversation turned to the night of the shooting, Appellant said that he was "mad that day about something. * * * And he said he had to put somebody in line and because of that, he started drinking some energy -- Rockstar energy drink, and according to him he drank a lot of -- a lot, a lot, a lot of Rockstar energy drink* * *." (Tr., p. 688.)

[*P30] According to Spotleson, Appellant said that he bought the gun for his own protection because "[a] lot of people don't like him for some reason and he had to protect his valuables and himself." (Tr., p. 689.) With respect to the shooting, Spotleson said that Appellant told him that "he was going off the music* * *he was twisted; that he wasn't in the right state of mind; and he was going off the music, listening to the music. He just hung out the window and just started shooting." (Tr., pp. 689-690.)

[*P31] In this appeal, Appellant contends that he did not act purposely or voluntarily when he fired into the group of teenagers walking on Ford Avenue. R.C. 2903.02(A) reads, in pertinent part, "[n]o person shall purposely cause the death of another * * *." In Ohio, a person is not guilty of an offense unless his conduct includes a voluntary act, and he has the requisite degree of culpability for each element as to which a culpable mental state is specified by the section defining the offense. R.C. 2901.21(A).

[*P32] Involuntary acts are defined by the code as, "[r]eflexes, convulsions, body movements during unconsciousness or sleep, and body movements that are not otherwise a product of the actor's volition." R.C. 2901.21(D)(2). A person acts purposely when it is his specific intention to cause a certain result. R.C. 2901.22(A).
[*P33] Prior to October of 2000, voluntary intoxication was a defense if it was shown to have prevented the defendant from forming the intent necessary to commit the charged offense. *State v. Love, 7th Dist. No. 02CA245, 2006 Ohio 1762, ¶63*. However R.C. 2901.21(C) was amended to read:

[*P34] "Voluntary intoxication may not be taken into consideration in determining the existence of a mental state that is an element of a criminal offense. Voluntary intoxication does not relieve a person of a duty to act if failure to act constitutes a criminal offense. Evidence that a person was voluntarily intoxicated may be admissible to show whether or not the person was physically capable of performing the act with which the person is charged."

[*P35] With respect to the determination as to whether Appellant acted purposely, the trial court provided the following instruction to the jury: "Deadly weapon: If a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life, the purpose to cause the death may be, but is not required to be, inferred from the use of

6

the weapon. The inference, if made, rests with you." (Tr., p. 955.)

*Ohio v. Glenn*, 2011-Ohio-543, ¶¶ 1–35 (Ohio Ct. App. 2011).

### PROCEDURAL BACKGROUND

On May 31, 2007, a Mahoning County grand jury indicted Petitioner on six counts – one count of aggravated murder under Ohio Revised Code § 2903.01(A) and five counts of attempted murder with firearm specifications. (Doc. 7-2). Following a jury trial (Docs. 7-5–7-9), Petitioner was acquitted of aggravated murder but convicted of murder and five counts of attempted murder with firearm specifications (Doc. 7-3, at 3–4). On March 11, 2009, he was sentenced to a term of fifteen years to life on Count One, ten years on the Count 2 attempted murder conviction (to be served consecutive to the Count One sentence), five years on each of the other attempted murder convictions (to be served concurrent with each other but consecutive to the Count One sentence), and five years on the firearm specification (to be served prior to and consecutive to the Count One sentence) for an aggregate term of 35 years to life in prison. (Doc. 7-3, at 3).

After being sentenced, Petitioner filed a timely notice of appeal in the Seventh District Court of Appeals through new counsel contending (1) his convictions were not supported by sufficient evidence to establish he acted voluntarily and purposely and (2) his convictions were against the manifest weight of the evidence. (Doc. 7-11, at 6; Doc. 7-12). The State filed a response (Doc. 7-13) and on February 4, 2011 the Seventh District Court of Appeals affirmed the conviction (Doc. 7-11, at 2); *Glenn*, 2011-Ohio-543.

Through counsel, Plaintiff filed a timely notice of appeal and jurisdiction memorandum with the Ohio Supreme Court presenting one proposition of law:

The voluntariness of a defendant's actions, which is a required element to a crime under R.C. 2901.21(A), may be inferred from the surrounding circumstances. An act is involuntary and

7

the state fails to prove beyond a reasonable doubt that the defendant acted voluntarily if the defendant is intoxicated and the evidence supports the view that the defendant did not affirmatively direct his or her actions.

(Doc. 7-16, 7-17). The State filed a waiver of memorandum in response (Doc. 7-18) and the Ohio Supreme Court declined to hear the case on May 4, 2011 (Doc. 7-19).

On April 18, 2012, within the one-year habeas limitations period that starting running on August 2, 2011, Petitioner filed the instant Petition when he placed it into the prison's mail system. (*See* Doc. 1, at 16); *see also Lawrence v. Florida*, 549 U.S. 327, 333 (2007) (citations omitted).

### DISCUSSION

Petitioner challenges his conviction and asserts one ground for relief, contending there was insufficient evidence to support his conviction because "the random pattern of the gun shots established that [he] did not voluntarily or purposely cause the death of another." (Doc. 1, at 6). He presented his claim on direct appeal and in the Ohio Supreme Court and therefore exhausted his state court remedies. (*See* Doc. 7-12; Doc. 7-17). For the reasons below, the Court should deny and dismiss the Petition.

<u>Sufficient Evidence Supported Petitioner's Conviction</u>

When the basis for a federal habeas claim has been previously adjudicated by the state courts, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides the writ shall not issue unless the state decision "was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A federal court may grant habeas relief if the state court arrives at a decision opposite to that reached by the Supreme Court of the United States on a question of law, or if the state court decides a case differently than did the Supreme Court on a set of materially indistinguishable facts.

8

*Williams v. Taylor*, 529 U.S. 362, 405 (2000). The appropriate measure of whether a state court decision unreasonably applied clearly established federal law is whether that state adjudication was "objectively unreasonable" and not merely erroneous or incorrect. *Williams*, 529 U.S. at 409–11; *see also Machacek v. Hofbauer*, 213 F.3d 947, 953 (6th Cir. 2000). To obtain "habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786–87 (2011).

Due process requires conviction only on proof of guilt beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 309–16 (1979) (citing *In re Winship*, 397 U.S. 358, 362-63 (l970)). The standard for sufficiency of the evidence is: "whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 318-19 (emphasis in original). "[T]he *Jackson* inquiry does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993) (emphasis in original). In examining a sufficiency claim, a habeas court can only look to "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 318. Even if the federal habeas court would not have convicted the petitioner, "it must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution", and even if a rational trier of fact could not have found a petitioner guilty, the federal habeas court still must "defer to the state appellate court's sufficiency determination so long as it is not

9

unreasonable." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009) (citing 28 U.S.C. § 2254(d)(2)).

Thus, the Court's task in Petitioner's case is to determine whether it was objectively unreasonable

for the Seventh District Court of Appeals to conclude a rational trier of fact viewing the evidence

in the light most favorable to the prosecution could have found beyond a reasonable doubt that

Petitioner committed the elements of the convictions.

After a jury trial, Petitioner was convicted of murder and attempted murder. On direct appeal,

the appellate court used the *Jackson* standard to consider whether any rational trier of fact could

have found the essential elements of the crime proven beyond a reasonable doubt. *See Glenn*, 2011-

Ohio-543 at ¶ 39. Finding sufficient evidence, the court found Petitioner's argument regarding the

trajectory of the bullets ignored "the majority of the testimonial evidence offered at trial". *Glenn*,

2011-Ohio-543 at ¶ 41. Specifically, the court summarized the evidence submitted regarding bullet

trajectory and noted:

> [*P41] . . . Raheem, Akeem, and Green testified that Appellant was shooting directly at
> them. Bullock and Hanibol both testified that they felt the bullets whizzing past them.
>
> [*P42] Second, the testimony of the students established that they scattered when they
> heard the gunfire, some of them hiding behind trees and another seeking cover behind
> an abandoned house. Consequently, the jury may have attributed the random shot pattern
> to the scattering of targets in the midst of the gunfire.
>
> [*P43] With respect to the argument that there was insufficient evidence to establish that
> Appellant acted purposely, several of the teenagers testified that he asked them if they
> were "BBH" before opening fire. There was testimony at trial that animosity existed
> between BMF and BBH, and Spotleson's testimony established that Appellant was angry
> on May 25, 2007, and that he had to "put somebody in line." (Tr., p. 688.)
>
> [*P44] Finally, the jury was permitted to infer from Appellant's use of the handgun that
> he acted with the purpose to cause death. Based on all of the evidence of record,
> Appellant's argument that the state failed to support the inference at trial lacks merit.
>
> [*P45] Viewing all of the evidence adduced at trial in a light most favorable to the
> prosecution, the jury could have found beyond a reasonable doubt that Appellant acted
> voluntarily and purposely when he fired the handgun in spite of the disbursement of

bullets among the three houses on Ford Avenue. Appellant's first assignment of error is overruled.

*Glenn*, 2011-Ohio-543 at ¶¶ 41–45.

The Revised Code defines murder as purposely causing the death of another, and "[a] person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." Revised Code §§ 2901.22(A), 2903.02(A). A person's intent to kill "may be presumed where the natural and probable consequence of a wrongful act is to produce death, and such intent may be deduced from all the surrounding circumstances, including the instrument used . . . , its tendency to destroy life . . . , and the manner of inflicting a fatal wound." *Ohio v. Robinson*, 161 Ohio St. 213, syllabus at ¶ 5 (1954); *see also Ohio v. Burke*, 73 Ohio St.3d 399, 404 (1995). Moreover, a jury can reasonably infer a defendant "formed the specific intent to kill from the fact that a firearm is an inherently dangerous instrument, the use of which is likely to produce death, coupled with relevant circumstantial evidence." *Ohio v. Shue*, 97 Ohio App. 3d 459, 468 (Ohio Ct. App. 1994) (citing *Ohio v. Widner*, 69 Ohio St.2d 267, 270 (1982)).

A rational trier of fact viewing the evidence in the light most favorable to the prosecution could have found beyond a reasonable doubt that Petitioner purposely caused the death of Maressia Patterson and it was not objectively unreasonable for the Seventh District Court of Appeals to so conclude. When Petitioner first spoke to police officers, he said he was mad at someone the day of the shooting and had to put someone in line. (Doc. 7-8, at 88–89). Petitioner admitted he took a loaded pistol with him to the party and shot it out the window of Jackson's moving car. (Doc. 7-9, at 27, 40, 43). He could not recall where he aimed but admitted firing every round in the weapon and

acknowledged he had to pull the trigger every time. (Doc. 7-9, at 61–62, 70–71, 95).[1] Other witnesses testified he shot directly at them after identifying them as members of BBH and the state appellate court found the shot pattern was consistent with a line of fire following moving targets as they fled. (*See* Doc. 7-6, at 171–73, 209–11; Doc. 7-7, at 82–85, 107–12, 125–28, 159–62, 185–87).

Plaintiff knew the consequences of aiming a gun at someone and pulling the trigger. (Doc. 7-9, at 44–45). The act of pointing a firearm and firing it in the direction of another human being is an act with death as a natural and probable consequence, and shooting into a crowd is a "strong indication" a defendant intended to shoot someone. *Ohio v. Collins*, 2005-Ohio-1642, ¶¶ 39–40 (Ohio Ct. App. 2005). Viewing the evidence in the light most favorable to the prosecution, a rational fact finder could have concluded this evidence established the purpose element of murder and attempted murder. The evidence showing Plaintiff took a loaded gun to a party and began shooting into a crowd after identifying them as members of a rival group could reasonably support a finding of guilt beyond a reasonable doubt and the state appellate court adjudication was not "objectively unreasonable". *See Williams*, 529 U.S. at 409–11*; Jackson*, 443 U.S. at 318. Petitioner has not shown insufficient evidence supported his conviction and the Court should deny Ground One of the Petition.

### CONCLUSION AND RECOMMENDATION

Following review of the record, arguments presented, and applicable law, Petitioner's sole asserted ground for relief lacks merit.  Therefore, the Court should deny and dismiss the Petition.

s/James R. Knepp, II
United States Magistrate Judge

---

1. Seven shell casings were recovered, indicating Plaintiff fired seven rounds toward the group as they fled. (*See* Doc. 7-7, at 35; Doc. 7-8, at 24–25).

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).